BROCK & *ux. versus* CHASE.

Of the evidence by which the existence of a town way may be established.

ON REPORT from *Nisi Prius*, RICE, J., presiding.

TRESPASS *quare clausum.*

The defendant pleaded the general issue, and justified his
acts as a surveyor of the highways.

After the evidence was out, it was agreed that the cause
might go before the full Court on report, they having au-
thority to draw inferences as a jury might from the evidence
and enter such judgment as the law and facts might war-
rant.

The whole case will be found in the opinion of the Court,
which was drawn up by

RICE, J. — That the plaintiffs are owners in fee of the
*locus in quo* is not controverted.  Nor is it controverted
that the defendant, in entering upon the land and perform-
ing the acts complained of, was acting in the capacity of a
surveyor of highways, duly qualified.  The only question in
controversy is, whether there was a way across the plain-
tiffs' land upon which the town had a right to enter, for the
purpose of making repairs.  Such right the plaintiffs deny;
and some seven or eight years before the alleged trespass
they had closed up the ends of the way in dispute, by con-
structing permanent fences across the ends thereof.  These

fences were removed by the defendant, so far as was necessary to go upon and repair the way.

To show the existence of such a way, the defendant introduced one William McKenney, who testified, among other things, "that when he was a boy, James Jordan, (who for many years owned the premises on which the plaintiffs now live,) came round with a paper, where we were at work on the Freeport road, to get people to sign, to get the town to discontinue the Chase road, and open the cross road, (the road now in dispute,) instead. Mr. Jordan opened the cross road and it was fenced out. Jordan built part of the fence upon the road. I did not live in the Chase neighborhood at the time Jordan opened the road. I then lived with my father. The road was worked upon and repaired by the district, and the fences remained upon the sides until they became old and rotten. The road was plowed on the sides, from one end to the other, on both sides. There were two stone culverts in it, built by the district. Think I might have been ten years old when Jordan carried round the paper; I am now fifty-six. I have had some conversation with Mr. Jordan in relation to the opening of the road, while he was owner of the land now in dispute. In 1825 the old man told me that the Chase road, east of the cross road, had been discontinued, and he had given this one in place of it. This was while we were working on the road; I was surveyor. He has told me the same thing at other times. Generally when we were at work upon the road, he would come out and talk with us about it."

*On cross-examination* this witness testified, " I should think Jordan went round with the paper referred to, prior to 1809. The road was fenced out on both sides. The road was given to the town in 1809. I am unable to tell how long after that it was fenced out. I lived in the vicinity till 1841, and then moved away, and was gone two years, when I came back and lived there ten years. I was surveyor in 1845. The remains of the old fence was then on the side of the road. There were bars across each end of the

road when I moved there in 1825. There are three families who live in there, who are mostly accommodated by this road.

"Jordan told me he gave the land for the road. I have seen a good many pass over this road. After I moved there, I told them that if they did not put gates up at the ends of the road, they should fence it out. The bars and gates were put up and kept up by Mr. Jordan and Mr. McKenney. They made no claim of right to fence up the road, but the people living in there consented that they should put bars across at the ends, to avoid fencing out the road. But when I went there, I told them if they did not put gates up instead of bars, they should fence the road, and they did so. Mr. Jordan told me that the bars were put up by permission.

Charles F. McKenney testified, "that he had known this road about forty years; have traveled over it; never saw any one at work on it. It was fenced on both sides. It had been ploughed and turnpiked up some; were two culverts across it. Should think the road was fenced out something like forty years ago, and I never knew any bars or gates at the ends of this road, until the fences had gone to decay.

Humphrey Vosmus testified, "that he was acquainted with the road and land about there. The road was fenced clear through from the county road. It was opened like any other road, and was an open road from eight to ten years. In 1846 and 1847 I was at work for Mr. McKenney. Mr. Webb came along there and said he was going to stop that road up. Mr. McKenney asked by what authority. He said he had been told by Col. Ingersoll that there was no road there."

The defendant also read to the jury, from the records of the town of Danville, the following extracts, containing the votes of said town relative to the road in dispute.

"Voted to discontinue the road from the northerly corner of James Jordan's land, southerly to the road leading from New Gloucester to Androscoggin river, and lay out

and locate a road south-west from the same corner of James Jordan's land to the county road leading through John Vosmus' land, towards Freeport, in its stead."

" The above vote was passed at a legal town meeting of the inhabitants of Pejepscot, now Danville, Nov. 9, 1809."

The following was a vote passed at a legal meeting of the inhabitants of said town, May 12, 1810.

" Voted to accept the report of a road laid out from James Jordan's northerly corner, south-west to the county road leading through John Vosmus' land towards Freeport."

It was admitted that the above extracts refer to the road in dispute.

There was evidence that this road had been assigned for many years to the several highway surveyors of one of the districts of said town, as a part of the road to be repaired by them, and that it had been so repaired under their direction. There was evidence that it had been left out of the assignment for one year by one of the selectmen, but was again restored, and has subsequently been included in the assignments of highways, as a part of the district to which it had previously been assigned.

There was much testimony introduced by both parties as to the manner in which this road had been fenced and used prior to the time it was first obstructed by a permanent fence near seven or eight years ago.

The records of the original laying out and location are informal and imperfect. It does not appear to have been a road upon which there had ever been any considerable amount of travel. But we think the evidence does show, that there was an original laying out on the part of the town, and a continual user by the public either as an open way, or encumbered only by movable bars or gates, which were placed across the ends thereof, not however under a claim of right, by the owners of the premises, now owned by plaintiff, but by the consent of those most interested in the road for a period of more than thirty years, and during

most of that time the town repairing the road from year to year. Those facts, together with the acts and admissions of Jordan, and the long acquiescence of the other proprietors, fully authorize the inference, that the road was originally legally laid out as a town way. At least, we think, after this long lapse of time, it is too late for the plaintiffs to controvert this fact. Whether the public have a right to an open way, unincumbered by gates or bars, it is not necessary now to decide. But the plaintiffs, by obstructing this way by permanent and immovable fences, were guilty of invasion of the public right. And the defendant, by removing these obstructions, in the manner he is proved to have done, committed no trespass upon the rights of the plaintiffs. According to the agreement of the parties a nonsuit must be entered.

*Record*, for defendant.

*Morrill & Fessenden*, for plaintiffs.